# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-4217

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Nebraska. |
| Gilberto Sanchez, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted: April 16, 1998
Filed: September 28, 1998

_____

Before FAGG, JOHN R. GIBSON, and HANSEN, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Gilberto Sanchez appeals from the sentence imposed upon him following his conditional guilty plea to a charge of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (1994). Sanchez first argues

that the district court[1] erred in denying his motion to suppress the methamphetamine seized following what the court determined to be a consensual search. Second, he argues that the jury selection process employed below violated the Sixth Amendment's fair-cross-section requirement by systematically excluding various racial and ethnic groups; see Duren v. Missouri, 439 U.S. 357 (1979). We affirm Sanchez's conviction and sentence.

During the morning of June 14, 1996, DEA Agent Charles Noonan received an anonymous telephone call regarding an impending delivery of "speed" to Omaha. The caller related the courier's travel plans: the individual would arrive in Omaha at 12:00 by Amtrak from California, via Kansas City. The courier was described as an Hispanic male named Gilbert, approximately five feet eight inches in height, with curly dark hair, a light mustache, and a medium to dark complexion. A later call from the anonymous source revealed the courier's last name as Sanchez. Noonan contacted Amtrak and was informed that it provides no rail service between Kansas City and Omaha; nevertheless, he learned that Amtrak passengers bound for Omaha frequently arrive from Kansas City by Greyhound bus. Noonan then called Omaha's Greyhound bus depot and discovered that a bus would arrive from Kansas City at 11:20 a.m. that day.

Noonan asked DEA Agents William Johannes and James McDowell to accompany him to the bus station. The three arrived shortly after 11:00 a.m., and Noonan awaited the Kansas City bus's arrival. Noonan observed three Hispanic males get off of the bus; one of the men matched the anonymous caller's description almost identically, and was later identified as Gilberto Sanchez. As Sanchez walked through the bus terminal, his behavior was fidgety and nervous. Johannes entered the terminal, and he and Noonan finally approached Sanchez. They identified themselves as DEA agents and displayed their credentials. Noonan told Sanchez that he would like to

---

[1]The Honorable Thomas M. Shanahan, United States District Judge for the District of Nebraska.

speak with him for a few minutes but informed Sanchez that he was under no obligation to speak with them. When asked his name, Sanchez replied "Gilbert." Noonan then asked for a last name, which Sanchez provided. When Noonan asked to see Sanchez's identification, Sanchez handed him his bus ticket. Noonan then asked whether Sanchez had any photographic identification, and Sanchez provided a fake California driver's license. All the while, Sanchez's hands shook nervously.

Johannes asked Sanchez if he could inspect the two bags that Sanchez was carrying but informed Sanchez of his right not to consent to the search. Sanchez initially said that Johannes could inspect the bags. Sanchez then stated that DEA agents in Kansas City had already done so. Johannes responded that he nevertheless wished to inspect the bags again, and he again told Sanchez that he did not have to permit the search. Sanchez once more told Johannes and Noonan that they could look through the bags. Johannes inspected a duffle bag and found a starter jacket inside. He felt an object in one of the jacket pockets, and he removed a large bundle wrapped tightly in black duct tape. Johannes asked Sanchez what the bundle contained, and Sanchez replied, "Meth." Noonan then arrested and handcuffed Sanchez. After transporting Sanchez to the DEA office, Johannes advised Sanchez of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Sanchez said that he understood his rights but that he did not understand English very well. At that point, Noonan and Johannes ended the conversation.

Before the district court, Sanchez moved to suppress the methamphetamine seized from his jacket. He argued he did not understand English, that Noonan and Johannes knew or should have known of this language barrier, and that this barrier vitiated Sanchez's consent to the luggage search. The magistrate judge[2] denied the motion, finding that Sanchez had consented to the search or, alternatively, that the agents reasonably believed that Sanchez had done so. The magistrate judge also

---

[2]The Honorable Kathleen A. Jaudzemis, United States Magistrate Judge.

determined that the initial encounter between Sanchez and the agents was either (i) voluntary or (ii) supported by "reasonable suspicion" and thus a valid investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968). The district court adopted the magistrate's report and recommendation in full. Sanchez entered a conditional guilty plea to preserve his Fourth and Sixth Amendment claims. The court imposed a sentence of thirty months' imprisonment, three years' supervised release, and a $100 special assessment. This appeal followed.

## I.

Sanchez presents only one Fourth Amendment claim on appeal, challenging the luggage search. In light of his limited English and the officers' "double teaming" approach, Sanchez contends that he did not consent to the search and that reasonable officers in Noonan and Johannes's position could not have believed that he consented. We are not persuaded. The voluntariness of one's consent to a search presents a factual question. United States v. Barahona, 990 F.2d 412, 417 (8th Cir. 1993); United States v. Galvan, 953 F.2d 1098, 1101 (8th Cir. 1992). We must accept the district court's finding of voluntariness, absent clear error. United States v. Galvan-Muro, 141 F.3d 904, 907 (8th Cir. 1998); United States v. Czeck, 105 F.3d 1235, 1239 (8th Cir. 1997). We have carefully examined the record and find no such error.

One's consent to a search is voluntary if it results from "an essentially free and unconstrained choice" rather than from "duress or coercion." Galvan-Muro, 141 F.3d at 907; United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (citations omitted). Whether consent is voluntary depends upon the "totality of the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). When evaluating such circumstances, we pay particular attention to the characteristics of the person giving consent and to the encounter from which the consent arose. United States v. Thomas, 93 F.3d 479, 486 (8th Cir. 1996); Chaidez, 906 F.2d at 380-81. Relevant characteristics of the consenting party include age, intelligence and education; chemical

intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation. Chaidez, 906 F.2d at 381. To assess the environment surrounding the consent, we consider the length of time that the suspect was detained and questioned; whether the police intimidated the suspect; whether the suspect relied upon promises or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the encounter occurred in a public or secluded place; and whether or not the suspect objected to the search. Id.

Finally, whether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual. Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990); United States v. Sanchez, 32 F.3d 1330, 1335 (8th Cir. 1994), cert. denied, 513 U.S. 1158 (1995).

The government must prove that Sanchez consented to the luggage search or that the officers reasonably so believed. See Florida v. Royer, 460 U.S. 491, 497 (1983); Barahona, 990 F.2d at 417. We conclude that the government met its burden of proof and that the record amply supports the district court's findings. Agents Noonan and Johannes both testified that Sanchez appeared to understand the questions directed to him. When asked to do so, Sanchez twice gave the officers express permission to inspect the bags. Other responses to the agents' questions similarly evince Sanchez's grasp of the conversation: Sanchez gave his name, provided photographic identification, stated that DEA agents in Kansas City had earlier searched his luggage, and described the contents of the tape-wrapped package as "meth." If indeed Sanchez did not consent to the luggage search, Noonan and Johannes reasonably believed otherwise.

Furthermore, we are undisturbed by the agents' alleged "double-teaming." The record lacks any evidence of duress, intimidation, or over-reaching by the officers. Noonan and Johannes twice told Sanchez that he need not permit the luggage search;

they wore plain clothes and kept their weapons concealed; they conducted the interview in a normal, courteous tone of voice; they advised Sanchez that he could refuse to speak with them; and they refrained from physically touching Sanchez until arresting him after the search.  In short, the district court did not clearly err by finding the luggage search consensual.

## II.

We are equally unpersuaded by Sanchez's <u>Duren</u> claim.  Sanchez takes issue with the District of Nebraska's particular method of jury selection, alleging a violation of the Sixth Amendment's fair-cross-section requirement.[3]  His claim presents a mixed question of law and fact which we review <u>de novo</u>.  <u>See</u> <u>United States v. Morgan</u>, 91 F.3d 1193, 1195 (8th Cir. 1996), <u>cert. denied</u>, ___ U.S. ___, 117 S. Ct. 965 (1997).  To prevail, Sanchez must prove:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

<u>Duren</u>, 439 U.S. at 364.

Potential jurors in the District of Nebraska are drawn exclusively from voter registration lists of each of the state's ninety-three counties.  Because African-Americans, Hispanics, Asian-Americans and Native Americans are less represented on jury wheels than in the general population, Sanchez asks that we invalidate the District

---

[3]Sanchez also claims a violation of the Jury Selection and Service Act, 28 U.S.C. §§ 1861-78 (1994).  We analyze the Act and the Sixth Amendment's fair-cross-section requirement under identical legal standards.  <u>See</u> <u>United States v. Clifford</u>, 640 F.2d 150, 154 (8th Cir. 1981).

of Nebraska's reliance upon voter registries.  We decline to do so.  We have consistently upheld the use of voter registration lists to select jury pools.  Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996); United States v. Rogers, 73 F.3d 774, 775 (8th Cir.), cert. denied, 517 U.S. 1239 (1996); United States v. Garcia, 991 F.2d 489, 492 (8th Cir. 1993);  Floyd v. Garrison, 996 F.2d 947, 949 (8th Cir. 1993) (equal protection analysis).  Ethnic and racial disparities between the general population and jury pools do not by themselves invalidate the use of voter registration lists and cannot establish the  "systematic exclusion" of allegedly under-represented groups.  Floyd, 996 F.2d at 949; Garcia, 991 F.2d at 491-92.  Absent proof that certain racial or ethnic groups face obstacles in the voter registration process, Sanchez's claim must fail.  See Floyd, 996 F.2d at 449; Garcia, 991 F.2d at 491 (exclusion not systematic unless "inherent in the particular jury-selection process utilized") (quoting Duren, 439 U.S. at 366).  Despite counsel's painstaking efforts to develop an adequate record below and to assemble the data underlying Sanchez's claim, we lack the authority to depart from this circuit's well-settled law.

The parties raise several other issues subsidiary to Sanchez's Duren claim: whether Hispanics are a "distinctive" group in the community; whether a party can demonstrate "unfair" and "unreasonable" group representation through the use of "comparative" -- rather than "absolute" -- disparities between the ethnic composition of jury pools and the general population;[4] and whether the data relied upon by

---

[4]"Absolute disparity" describes the percentage-point difference between a group's representation in the general population and that in the jury pool.  For instance, Sanchez's expert found that Hispanics represent 1.969 percent of Nebraska's population; meanwhile, only 0.821 percent of those in jury pools identified themselves as Hispanic.  These figures present an "absolute disparity" of 1.148 -- the difference between the two figures.  Meanwhile, "comparative disparity" measures "absolute disparity" in terms of the group's relative size in the general population.  One simply divides the "absolute disparity" by the percentage of the population represented by the group in question.  Thus, Sanchez's expert concluded that the comparative disparity for Hispanics was 1.148/1.969, or 58.3 percent.

Sanchez's experts are trustworthy. We need not address these questions. We simply hold that when jury pools are selected from voter registration lists, statistics alone cannot prove a Sixth Amendment violation.

## III.

For the foregoing reasons, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.