# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-3356

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Arkansas. |
| Roxanne Hill, | * | |
| | * | [UNPUBLISHED] |
| Appellant. | * | |

_____

Submitted: February 5, 1999
Filed: February 17, 1999

_____

Before FAGG, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

PER CURIAM.

Roxanne Hill appeals her conviction for a drug offense following her conditional guilty plea. For reversal, she argues that the district court[1] erred in denying her motion to suppress evidence. We affirm.

_____

[1]The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas, adopting the report and recommendations of the Honorable Beverly R. Stites, United States Magistrate Judge for the Western District of Arkansas.

Hill first argues that the stop of her vehicle was not supported by reasonable suspicion. In assessing the validity of an investigatory stop, we review for clear error the findings of historical fact, and review de novo the legal conclusions based upon those facts. See United States v. Pena-Saiz, 161 F.3d 1175, 1177 (8th Cir. 1998). At the suppression hearings, government witnesses testified as follows.

A confidential informant (CI) provided narcotics detective Paul Smith with information that Francisco Ocampo was the head of a drug trafficking ring, and that Alberto Cortez, Rogelio Toledo, and a white male named "Jimbo" and a white female that "Jimbo" lived with in Flippin, Arkansas, worked for Ocampo. The CI had delivered methamphetamine to the Flippin couple, and had collected drug proceeds from them to give to Ocampo. The CI informed officers that on January 9, 1998, a large load of methamphetamine was to be transported to a Super 8 motel, and on to Booneville, Arkansas; and that Ocampo and Cortez would be involved. Surveillance established that Ocampo and Cortez were at the motel on January 9, and that a Suburban and a Honda traveling in tandem arrived at the motel, and then left. Furthermore, a traffic stop of the Suburban revealed that Cortez was in the vehicle, and nearly 4.7 pounds of methamphetamine were recovered from the Honda when it was later stopped away from the Suburban. The methamphetamine was to be delivered to Booneville, Arkansas. Cortez did not know that the drugs were seized.

Surveillance of the Super 8 motel the next day revealed that Ocampo and Cortez were there, and were joined by a man and a woman driving a black pickup truck from Flippin, Arkansas. The woman was later identified as Hill, and the man was later identified as her co-defendant, James Norcross. Ocampo and Cortez left the motel going towards Fort Smith, Arkansas, and were followed by Norcross and Hill in the truck. Detective Smith witnessed the vehicles drive in a manner which, in his experience, suggested they were engaging in counter-surveillance. The vehicles were followed to Ocampo's apartment in Fort Smith. Norcross, accompanied by Hill, carried a stereo component from the truck into the apartment. In Detective Smith's

experience, stereo equipment is often used by Hispanic gangs to hide drugs. Ocampo and Cortez were already in the apartment, and they were later joined by Toledo. Shortly after Toledo arrived, Norcross and Hill left the apartment with a stereo component; they were followed and stopped by a marked squad car.

We conclude that the corroborated information provided by the CI which correctly predicted future actions of these individuals, combined with the officers' observation of the counter-surveillance attempts and Norcross's transporting the stereo component, established reasonable suspicion to stop the vehicle. See United States v. Hill, 91 F.3d 1064, 1069 (8th Cir. 1996); United States v. Johnson, 64 F.3d 1120, 1124-25 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996).

Hill next argues that the consent she gave to search the vehicle was not voluntary. The voluntariness of consent is a fact question to be determined from the totality of the circumstances, and is reviewed for clear error. See Pena-Saiz, 161 F.3d at 1177. Consent is not voluntary when it is the product of express or implied duress or coercion. See id; United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998) (listing factors to consider in assessing whether consent was voluntarily given).

The government presented evidence that Hill was questioned for only a couple of minutes and detained for only ten minutes before she gave consent; that after the initial stop--which the officers considered to be a high-risk situation--the officers did not yell, scream, or even speak with raised voices; and that the officers did not threaten, crowd around, or coerce Hill, or accuse her of being a liar. Instead, officers testified that when they spoke with Hill, they used calm and rational voices. Hill admitted she was informed she was not under arrest and she was not handcuffed before giving consent, and the encounter was in a public place. Officers testified that Hill immediately gave consent for the search when she was asked; Hill testified that she did not "have a problem" with the officers' searching the pickup; and Hill qualified her assertion that the officers screamed at her by stating that the volume of the officers'

conversations with her was "[p]robably a little louder" than "it should have been."  We conclude the district court did not clearly err in determining that Hill voluntarily consented to the search of the vehicle.

Accordingly we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.