# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-4071

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Robert Joseph Morin, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 9, 2003

Filed:  August 1, 2003

_____

Before BOWMAN, BEAM, and BYE, Circuit Judges.

_____

BEAM, Circuit Judge.

Robert Joseph Morin appeals from the district court's[1] denial of his motion for a new trial after he was convicted for murder and sentenced to life in prison.  We affirm.

_____

[1]The Honorable Patrick A. Conmy, United States District Judge for the District of North Dakota.

## I.    BACKGROUND

Morin was arrested on March 31, 2001, and charged with first-degree murder after Janice Houle was found stabbed to death[2] in her trailer home near Dunseith, North Dakota, on March 25, 2001. Within days of his arrest, prison medical staff prescribed anti-psychotic medication after Morin exhibited symptoms of paranoia, auditory hallucinations and other delusions. On May 25, 2001, Morin filed a formal notice of his intent to present an insanity defense, and on May 29, 2001, the court transferred Morin to the Federal Medical Center at Rochester, Minnesota, for a psychiatric evaluation.

Medical Center physicians diagnosed Morin with psychological disorders ranging from anxiety disorder and polysubstance dependence to various forms of psychosis. Morin hired his own expert psychiatrist, Dr. Lawrence Widman, who began evaluating and treating Morin in September 2001. Dr. Widman enlisted the help of Dr. Todd Stull, who assumed the active role of treating Morin on December 10, 2001. Dr. Stull began easing Morin off his anti-psychotic medication in order to more accurately evaluate Morin's condition, and Morin was "completely off" the medication by December 31, 2001. Morin's condition worsened at that point: he experienced more frequent auditory hallucinations and paranoid delusions, he assaulted another inmate, and he assisted an inmate's suicide while in the Ward County Jail. Drs. Widman and Stull both concluded that Morin was, indeed, psychotic and diagnosed him with paranoid schizophrenia, alcohol, marijuana, methamphetamine and inhalant dependence, and anxiety disorder. Dr. Stull then

---

[2]An autopsy revealed numerous cut and stab wounds, including at least twenty-five stab wounds to the head, the deepest of which was one-and-a-half inches. The forensic examiner determined the primary cause of death was a three-inch cut across Houle's neck.

prescribed a different anti-psychotic medication, which Morin began taking on January 17, 2002. He had been off his medication for about seventeen days.

Sometime in March 2002, Morin's lawyer informally requested a hearing for the purpose of establishing that Morin, while medicated, was competent to waive his right to be competent at the time of trial. Morin's lawyer indicated to the court that he intended to discontinue Morin's medication in order to present him at trial in an unmedicated, psychotic state. After noting Morin's disruptive and violent behavior while off his medication in January, the court stated:

> I have the feeling that I am being asked to order that the defendant be allowed to be disruptive and potentially dangerous to himself and others for the sole purpose of demonstrating that the defendant is disruptive and potentially dangerous to himself and others while not medicated. Hasn't this already been well demonstrated?

United States v. Morin, No. C4-01-012, slip op. at 2 (D.N.D. Mar. 13, 2002). The court noted, however, that Morin was not being forcibly medicated:

> I am not aware of any order or action by this court or the government requiring that Mr. Morin take any medication. He is taking medications prescribed by his attending physicians. At first blush it would appear that he is free to stop if he wants, and we would then face the issue of whether or not a trial can be held.

Id.

Nevertheless, on July 19, 2002, Morin filed a formal motion to waive competency at trial. He stated in his supporting memorandum that (1) he intended to testify at trial; (2) he desired to refuse medication beginning August 1, 2002, so that his "mental processes will not be altered by the medication" during trial; and (3) in the event that discontinuing his medication rendered him incompetent to stand trial,

he desired to waive the competency requirement as he had instructed his attorney how to proceed in the case. The government opposed the motion and requested permission to forcibly medicate Morin in the event that he discontinued his medication. In the meantime, Burleigh County Detention Center administrators indicated that, because of safety and security concerns, they would refuse to house Morin if he stopped taking his medication.

On August 9, 2002, while the district court was still considering the motions, Dr. Widman contacted the Burleigh County Detention Center where Morin was then being held and instructed officials to "wean Morin off his meds" in preparation for the September 9, 2002, trial date. But the staff informed Dr. Widman that they would continue to provide Morin with his prescribed medications until they were instructed to do otherwise by the U.S. Attorney. Then on August 15, 2002, the court denied both Morin's motion to waive competency and the government's request for permission to forcibly medicate Morin: "Mr. Morin is under no compulsion to take his medication. The Court will not allow Mr. Morin to waive competency. Mr. Morin's trial will not proceed as scheduled if his failure to take his medication renders him incompetent." United States v. Morin, No. C4-01-012, slip op. at 3 (D.N.D. Aug. 15, 2002). Detention Center staff discontinued Morin's medication on August 16, 2002, one week after Dr. Widman's original request and twenty-four days before the trial was scheduled to begin.

At trial, Morin's lawyer told the jury in opening statements that, although Morin intended to testify, his testimony would be limited because he had difficulty remembering the events surrounding Houle's death. But according to Morin's lawyer, after hearing the testimony of Daryl Fisherman, a witness for the government who was present with Morin in Houle's trailer on the night of the crime, Morin suddenly remembered details of the incident and testified clearly to his recollection. Morin's testimony supported his asserted defense that, although he was present, someone else committed the killing. Having heard from the government's witnesses, from Morin,

-4-

and from several of the physicians and medical experts who had treated Morin, the jury rejected Morin's version of the incident and his insanity defense and found him guilty on all counts. Morin was sentenced to life in prison on November 20, 2002.

Morin filed a motion for a new trial on November 24, 2002. He argued that the one-week delay in discontinuing his medication before trial prejudiced his defense. The district court denied the motion, and Morin appeals. He argues that, had the court directed Burleigh County Detention Center staff to discontinue his medication on the date of Dr. Widman's request, Morin would have experienced a "window of clarity" approximately one week prior to trial instead of during his testimony. According to Morin, this would have allowed him to assist his counsel in his defense, but also would have allowed the jury to see him in his unmedicated, psychotic state during trial, thus reinforcing his insanity defense. He also argues that (1) the court violated his constitutionally protected right to waive competency; (2) he was denied a fair trial because the jury selection process failed to include a single Native American[3] on the panel; and (3) there was insufficient evidence to support the jury's verdict.

## II.    DISCUSSION

### A.    Medication and Competency

We review the denial of a motion for a new trial for abuse of discretion, giving great deference to the district court's judgment, and reversing only where the verdict is against the weight of the evidence and constitutes a great miscarriage of justice. Jones v. TEK Indus., 319 F.3d 355, 358 (8th Cir. 2003).

------

[3]Morin is Native American.

Morin argues that the district court violated his due process rights by failing to order Burleigh County Detention Center staff to discontinue his medication on August 9, 2002, and by refusing to allow him to waive competency at trial. These contentions are without merit. In the first place, we need not reach the issue of whether Morin was entitled to waive competency because Morin's competency at trial was never challenged. Thus, he had no opportunity to waive the requirement. Indeed, as we discuss below, one of Morin's chief complaints is that he was *too* competent at the time of trial.

Morin's argument concerning his right to discontinue medication centers around the United States Supreme Court's decision in <u>Riggins v. Nevada</u>, 504 U.S. 127 (1992), but that case and the recent decision in <u>Sell v. United States</u>, 123 S. Ct. 2174 (2003), deal specifically with court-ordered involuntary administration of anti-psychotic drugs. By contrast, the district court in this case declared on two occasions that Morin was free to stop taking his medication whenever he chose and denied the government's request for permission to forcibly medicate Morin. Morin's own doctors prescribed the medication. We acknowledge that the refusal by Detention Center staff members to stop *providing* Morin with medication, as well as their indication that they would refuse to house Morin if he stopped taking the medication, created a situation in which he might have felt pressure to continue his medication. But that does not equate to court-sanctioned involuntary administration. <u>Riggins</u> and <u>Sell</u>, which, incidentally, both outline standards for *permitting* court-ordered, forcible medication, simply do not apply to this case.

Morin also appears to suggest that the district court, and presumably the Detention Center staff, had an affirmative duty to repeatedly remind Morin of his right to refuse the medication that his own doctor prescribed. We disagree, and we find his contention that he was entitled to the district court's cooperation in producing a strategically timed, and medically unrecognized, "window of clarity" one week before trial so that he could appear in his natural, psychotic state on the witness stand

inventive but at least borderline frivolous.  The district court ruled that Morin was under no obligation to take his medication, and that ruling reached the Detention Center within seven days of Dr. Widman's request for the staff to discontinue medication.  The trial was still more than three weeks away.  And neither Morin nor his doctors had, at any point prior to trial, suggested that it was of constitutional importance that Morin be off his medication for four weeks.  Indeed, Morin's lawyer acknowledged in his motion for a new trial that it was only after the trial concluded that he and Dr. Widman discussed the possibility that an extra week would have produced the desired "window of clarity" and courtroom insanity at the preferred times.  It is patently absurd to suggest that the district court should somehow have predicted the interplay of medical science and trial strategy.  We find no abuse of discretion and affirm the district court's denial of Morin's motion for a new trial.

## B.     Jury Selection

Morin next argues that the absence of any Native Americans on the jury panel violated his Sixth Amendment right to a jury comprised of a fair cross section of the community.  Such challenges to jury selection present "a mixed question of law and fact" and are reviewed de novo.  United States v. Sanchez, 156 F.3d 875, 879 (8th Cir. 1998).  To prevail on his claim Morin must prove that (1) Native Americans are a distinctive group in the community; (2) their representation in his venire was not fair and reasonable in relation to their representation in the community; and (3) their under-representation resulted from their systematic exclusion from the jury-selection process.  Id.  The government does not dispute that Native Americans are a distinctive group in North Dakota.  The record is uninstructive with respect to the second prong.  But even if the representation of Native Americans in the venire was not fair and reasonable, Morin still cannot establish that Native Americans are systematically excluded in North Dakota.

The District of North Dakota draws its pools of prospective jurors randomly from lists of persons who voted in the last presidential election. United States District Court for the District of North Dakota, Plan for Random Jury Selection § 2. We have consistently upheld the use of voter registration lists in the selection of jury pools. Sanchez, 156 F.3d at 879. Absent proof that Native Americans, in particular, face obstacles to voter registration in presidential elections, "[e]thnic and racial disparities between the general population and jury pools do not by themselves invalidate the use of voter registration lists and cannot establish the 'systematic exclusion' of allegedly under-represented groups." Id. Morin has failed to establish that Native Americans are systematically excluded from jury pools in the District of North Dakota. We therefore reject his Sixth Amendment claim.

## C.      Sufficiency of the Evidence

Finally, Morin argues that the evidence was insufficient to support his conviction. We review sufficiency challenges de novo, examining the evidence in a light most favorable to the verdict. United States v. Fitz, 317 F.3d 878, 881 (8th Cir. 2003). We affirm unless no reasonable jury would have found each essential element of the crime beyond a reasonable doubt. Id.

Morin does not argue that the government failed to present evidence establishing the essential elements of the crimes with which he was charged. Rather, he claims that his own testimony, by contradicting the testimony of the government's witnesses, rendered the government's evidence insufficient. This argument is without merit. The jury has the sole responsibility for resolving conflicts or contradictions in the testimony, United States v. Holman, 197 F.3d 920, 921 (8th Cir. 1999), and may create its own version of the facts from conflicting accounts, United States v. Felix, 996 F.2d 203, 207 (8th Cir. 1993). We are required to resolve witness credibility issues in favor of the verdict. United States v. McCarthy, 97 F.3d 1562,

1571 (8th Cir. 1996). We hold that the evidence was sufficient for a reasonable jury to convict Morin of first-degree murder.

## III.  CONCLUSION

We affirm the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.