**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-4147

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Eliseo Tinoco Carrate, | * | |
| also known as Tinoco Eliceo, | * | |
| also known as Carrate Eliceo | * | |
| Tinoco, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: April 17, 1997

Filed:   September 4, 1997

_____

Before BOWMAN, HANSEN, and MURPHY, Circuit Judges.

_____

HANSEN, Circuit Judge.

Eliseo Tinoco Carrate (Tinoco[1]) appeals the judgment of the district court[2] denying his motion to suppress the evidence regarding a package containing approximately one kilogram of cocaine that was discovered when state troopers searched the car that Tinoco was driving at the time he was stopped for traffic violations. In support of his argument that the district court erred in denying his motion, Tinoco asserts that (1) the state troopers improperly detained him after completing the purpose of the traffic stop, (2) he did not consent to the search of the automobile, and (3) even if he did consent to the search, his consent was not voluntary. After reviewing the parties' arguments, we affirm the district court's decision to deny Tinoco's motion to suppress.

## I.

Just before midnight on the evening of February 16, 1996, Tinoco was driving eastbound on Interstate 80 in a 1990 Oldsmobile with Illinois license plates when Nebraska State Highway Patrol Troopers Pelowski and Wagner stopped him near North Platte, Nebraska, for an inoperative headlight and a speeding violation. Trooper Pelowski approached the driver's side window and asked Tinoco for his driver's license and registration. The driver's license identified Tinoco as Eliseo Tinoco Carrate of Santa Ana, California. The registration indicated that the owner of the vehicle was Guadalupe Gonzalez of Chicago, Illinois. Trooper Pelowski then inquired as to the origin and destination of Tinoco's trip. Tinoco, a Hispanic male, answered, in broken

---

[1]We are told that the correct use of the appellant's surname, short of using both his middle and last name, is to refer to his middle name--Tinoco.

[2]The Honorable William G. Cambridge, Chief Judge, United States District Court for the District of Nebraska, adopting the report and recommendation of the Honorable Thomas D. Thalken, United States Magistrate Judge for the District of Nebraska.

English, that he was en route from California to Chicago and that he was transporting the car for a friend.

Troopers Pelowski and Wagner returned to their patrol car and ran a computer records check on both Tinoco and the vehicle. The records check revealed that Tinoco was not wanted on any arrest warrants and that his license was not suspended, but it did indicate that Tinoco had an unspecified criminal record. There were no alerts on the Oldsmobile. The troopers decided to issue Tinoco a warning ticket for the speeding infraction and a violation notice for the inoperative headlight. Based on their observation of several factors that the troopers' training and experience caused them to be suspicious that Tinoco may be transporting illegal drugs, they also decided to ask Tinoco for permission to search the vehicle.

Trooper Pelowski returned to the driver's side window of the Oldsmobile with the ticket and warning, while Trooper Wagner stationed himself at the rear of the vehicle. Trooper Pelowski asked Tinoco to step out of the car and go to the rear of the vehicle so that he could explain the ticket and warning to Tinoco. What else, if anything, was said by Trooper Pelowski at this point in time is disputed by the parties. Tinoco maintains that Trooper Pelowski also told him that the troopers had the right to search the Oldsmobile because Tinoco was on probation in California. Tinoco also claims that as soon as he got out of the car, Trooper Pelowski asked Tinoco if Tinoco could open the trunk, thus, according to Tinoco, explaining why Tinoco turned around and reached back into the car to retrieve the keys from the ignition. Trooper Pelowski denies making these statements and maintains that he did not ask to search the vehicle until after Tinoco had walked to the rear of the car and had signed the traffic ticket. While the traffic stop and subsequent search of the vehicle were videotaped by a camera mounted in the front windshield area of the troopers' patrol car, there is no accompanying audio recording to verify what statements were actually made.

3

Nevertheless, it is undisputed, as evidenced by the videotape, that after Tinoco got out of the car, he turned around and reached back into the car and took the keys out of the ignition. Tinoco then walked to the back of the Oldsmobile where both Troopers Pelowski and Wagner were now standing, and he immediately inserted the car keys into the trunk lock. Trooper Pelowski prevented Tinoco from opening the trunk and explained the significance of the ticket and warning that he was giving to Tinoco. Tinoco signed the ticket using the trunk lid as a writing surface. Both troopers maintain that after returning Tinoco's driver's license and the registration, Trooper Pelowski asked Tinoco if he had any weapons, illegal drugs, or alcohol in the Oldsmobile, and Tinoco responded "No." Both troopers also claim that Trooper Pelowski then asked Tinoco if they could look in the car and he said they could and he opened the trunk. Tinoco, however, claims that Trooper Pelowski did not ask him these questions and that after signing the ticket, Tinoco opened the trunk to comply with Trooper Pelowski's alleged earlier <u>directive</u> to open the trunk.

After Tinoco opened the trunk, the troopers began their search of the entire vehicle. While Trooper Pelowski searched the trunk, Trooper Wagner searched the front of the car. Approximately ten minutes later, Trooper Wagner discovered a well-wrapped package behind the glove compartment and underneath the dashboard of the car. Trooper Pelowski then disassembled the dashboard and removed the package. The package contained a one-kilogram block of powder cocaine.

Tinoco was charged with one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and with one count of criminal forfeiture of the 1990 Oldsmobile under 21 U.S.C. § 853(a)(2). After the district court denied Tinoco's motion to suppress, Tinoco entered a conditional plea of guilty to both counts, reserving the right to appeal the district court's adverse suppression ruling. Tinoco then received a sentence of 60 months' imprisonment with five years of supervised release. Tinoco now appeals the district court's denial of his motion to suppress.

II.

Tinoco does not challenge the validity of the initial traffic stop, but he argues that the troopers were not justified in continuing to detain him after they handed him his traffic citations.  An officer must have a reasonable, articulable suspicion that a person is involved in criminal activity unrelated to the traffic violation before the officer may expand the scope of the traffic stop and continue to detain the person for additional investigation.  See United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994), cert. denied, 115 S. Ct. 2015 (1995); United States v. White, 42 F.3d 457, 460 (8th Cir. 1994).  "While we review the district court's findings of fact for clear error, we review de novo the district court's ultimate finding of reasonable suspicion."  United States v. Dodson, 109 F.3d 486, 488 (8th Cir. 1997).  In determining whether reasonable suspicion existed, "[w]e look to the totality of the circumstances, in light of the officer's experience."  Id.  See also United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994) (en banc).

In the circumstances of this case, we believe that the troopers were justified in asking Tinoco the two questions after issuing the traffic citations.  The troopers testified that the following factors raised their suspicion that Tinoco may have been transporting drugs: (1) Tinoco was not the owner of the vehicle, (2) Tinoco was in route from California to Illinois, (3) California is a point of origin for illegal drugs, (4) Chicago is a common destination for the shipment of illegal drugs, (5) Tinoco had very little clothing in the car to suggest a legitimate trip, (6) the six year-old car had high mileage, and (7) Tinoco had a prior criminal record in California.  The experience and training of the troopers had informed them that the listed factors were consistent with and indicative of drug courier characteristics.  We find that the facts of this case collectively provided the troopers with a reasonable suspicion that Tinoco was transporting illegal drugs, thus justifying their further questioning, detention, and investigation of Tinoco.  See Ramos, 42 F.3d at 1163 ("A trained officer may properly infer from a collection

of circumstances, no one of which itself indicates illegal activity, that further inquiry is appropriate.").

## III.

Tinoco next argues that he did not consent to the search of the Oldsmobile; he merely complied with Trooper Pelowski's alleged instruction to open the trunk. Tinoco relies heavily on the videotaped account of the traffic stop to make his argument. As mentioned above, the videotape reveals that a few seconds after Tinoco stepped out of the car, he turned around and leaned back into the car to retrieve the keys from the ignition. While Tinoco made these movements, the troopers took only a small step toward Tinoco. Tinoco claims that the troopers' casual response to Tinoco's abrupt movement indicates that the troopers knew that Tinoco was reaching merely for the car keys, as opposed to something more threatening, thus suggesting that Trooper Pelowski had, in fact, directed Tinoco to open the trunk. Tinoco reasons that if the troopers had not told him to open the trunk, as they maintain, they would have made more apprehensive movements towards Tinoco, fearing that he was reaching into the car for a weapon. Additionally, Tinoco claims that it is unlikely that Trooper Pelowski asked him for consent to search the car during the brief interval between the time Tinoco finished signing the ticket and the time he opened the trunk, as the troopers claim.

The district court rejected Tinoco's factual rendition and found that the troopers' slight movement toward Tinoco as he reached back into the car "supports the proposition that the Troopers were surprised by [Tinoco's] movement and that they halted their movement toward [Tinoco] when he immediately appeared with the keys from the ignition." (Appellant's Adden. at 21a.) The court then considered the possibility that Tinoco voluntarily brought the keys to the rear of the car and attempted to open the trunk before being asked to do so in order to misdirect the troopers by acting as if he had nothing to hide, knowing that the package of cocaine was behind the dashboard of the car. The district court thus concluded that Tinoco was first asked to

6

consent to a search of the car after he had signed the traffic citation and that he did, in fact, consent to such a search.

We will overturn a district court's determination regarding consent to search only if it is clearly erroneous. See United States v. Black, 88 F.3d 678, 680 (8th Cir. 1996), cert. denied, 117 S. Ct. 994 (1997). We consider this issue in light of the totality of the circumstances. Id. While the videotape reveals that Tinoco's interpretation of the movements that occurred during the traffic stop might be plausible, it does not establish that the district court's alternative conclusion is clearly erroneous. Nor does the videotape contradict the direct testimony of the troopers indicating that they did not direct Tinoco to open the trunk nor tell him that they had the right to search his car because he was on probation. The district court was free to believe the troopers' statement that they asked Tinoco if they could search his car after he had signed the traffic ticket and that Tinoco then allowed them to conduct the search. Moreover, we believe that there was sufficient time for Trooper Pelowski to ask Tinoco for his consent during the interval between the time Tinoco signed the ticket and the time he opened the trunk. We find no clear error in the court's conclusion that Tinoco consented to the search.

IV.

Finally, Tinoco asserts that even if he did consent to the search, he did not voluntarily do so. Tinoco claims that his limited ability to speak English combined with the fact that the troopers did not provide him with a written consent-to-search form or a verbal admonition that he was free to leave indicates that his consent was not voluntarily given. The district court disagreed and found that Tinoco voluntarily consented to the search.

The voluntariness of a person's consent to search is a question of fact that we review under the clearly erroneous standard. See Schneckloth v. Bustamonte, 412 U.S.

7

218, 227 (1973); United States v. Czeck, 105 F.3d 1235, 1239 (8th Cir. 1997). We have previously listed eleven factors relating to the characteristics of the person giving the consent and the environment in which the consent was provided that are relevant in determining whether such consent was voluntarily offered. See United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Tinoco's age, sobriety, and previous experience with the criminal justice system in California all suggest that Tinoco voluntarily consented to the search. Despite Tinoco's supposed limited ability to speak English, he understood and appropriately answered all of the troopers' questions, and he was able to testify at the suppression hearing as to the subject matter of the conversation that he had had with the troopers on the night in question. Furthermore, even though the troopers did not provide Tinoco with a written consent form or explicitly inform him of his right to withhold his consent, such actions are not necessary predicates to establish that a person voluntarily consented to a search. See Ohio v. Robinette, 117 S. Ct. 417, 421 (1996).

Additionally, the environment in which Tinoco consented to the search supports the district court's finding that Tinoco's consent was voluntary. Tinoco had been detained for only a short amount of time when he consented to the search; the troopers did not threaten or physically intimidate Tinoco; they did not make any promises or misrepresentations to him; Tinoco was not in custody or under arrest at the time he consented; he was on a public interstate; and he idly stood by while the troopers searched his car, never indicating that he objected to the search. Thus, we find no clear error in the district court's determination that Tinoco voluntarily consented to the search.

V.

Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.