# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1965

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Rosalind Sarah Morgan; | * | |
| Fredine Walker; Elijah M. Jones, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: May 15, 2001
Filed: October 16, 2001

_____

Before LOKEN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Rosalind Morgan, Fredine Walker, and Elijah Jones were stopped for a traffic violation on an interstate highway in Nebraska. A large amount of marijuana was discovered in their vehicle, and all three were indicted for possessing and attempting to possess marijuana with the intent to distribute. The district court granted suppression motions, and the government appeals. We reverse.

When Nebraska State Patrol Trooper Goltz was passed by a speeding van with Arizona license plates on Interstate 80 in Buffalo County, Nebraska, he activated his squad video camera and ran a check on the license. He learned that the plate was

registered to a Chevrolet sedan rather than a van, and he stopped the vehicle and pulled his car directly behind it.

As Goltz approached the passenger side of the van, he observed two women in the front seat and a man sitting behind the driver. He also saw a large duffel bag, approximately four feet long, next to the man in back. When the passenger rolled down her window, Goltz smelled cigar smoke as well as some kind of deodorizer or perfume. Goltz asked Walker, who was driving, for her license and registration. Walker produced her Michigan driver license, and passenger Morgan gave Goltz an Arizona rental agreement in her name. Goltz noticed that Morgan seemed nervous and did not make eye contact with him. He asked for identification from her and Jones, the passenger in the back seat. Goltz then returned to his car and ran computer checks on all three individuals. With him in the car were a drug dog and a visiting officer from Iowa.

Goltz returned to the van and asked Walker to step out to the rear. She told him that she was traveling from Arizona to her home in the Detroit area and that she had been in the Phoenix area four days, to see friends and shop. Goltz noticed that Walker was nervous and did not stand still or make eye contact with him. He told her he was going to give her a violation card but no citation, because the license mix up was the rental company's fault. Goltz then went to speak with Morgan and noticed a second large duffel bag on the seat directly behind Jones. He observed that the bag was "squared off," as if it contained "some type of square objects." Morgan told Goltz that she had gone to Arizona to visit a relative who had a baby, that Walker had come along for the ride, and that she thought Walker had relatives there. They had flown to Arizona where they stayed a week and then rented the van to return to Detroit with Jones, who was moving back to that area.

Goltz went back to his squad car to fill out the violation card and to wait for the results of the computer checks. He and Walker stood beside his squad car while they

waited. Goltz asked Walker if she had visited any other city in Arizona, and she responded that she could not remember. Walker also told Goltz she thought he had made up the license plate violation in order to stop the van.

After Goltz determined that none of the defendants had warrants and that Walker's license was in order, he returned the rental contract and licenses and gave the violation card to Walker. Walker said she did not want to drive anymore and went around to the passenger side of the van. Morgan got out of the van to take up driving and as she walked around the back toward the driver side, Goltz asked her "what she believed law enforcement was doing about the war on drugs." Morgan responded, and a short conversation ensued during which she seemed very nervous and did not look Goltz in the eye. When he asked her whether there was cocaine in the van, she looked at him for the first time and answered "no." When he asked if there was methamphetamine, she maintained eye contact and said "no." When he asked her about marijuana, she looked at the ground and answered "no." Goltz asked Morgan if he could search the van for drugs. Morgan asked what would happen if she refused, and he answered that he would walk his dog around the van. Morgan said "go ahead."

Goltz asked everyone to get out of the van and went back to his patrol car to get his dog. When he walked it over to the van, the dog alerted and began to bite, scratch, and paw at the door seams and back of the van. Something less than ten minutes elapsed between when Morgan had said "go ahead" and when the dog alerted. Goltz searched the van and found three large duffle bags containing what was later determined to be 281 pounds of marijuana. Morgan, Walker, and Jones were placed under arrest.

The van was driven to a state patrol office in Kearney, where a subsequent search revealed an additional ten pounds of marijuana in a suitcase containing women's clothes. All the luggage was taken into the building, and Goltz asked the

-3-

travelers to identify their bags so that they could be stored with the rest of their personal property. Morgan identified the suitcase that had the ten pounds of marijuana in it. At this point, the defendants had not been informed of their Miranda rights or that marijuana had been found in the suitcase.

The defendants filed motions to suppress the marijuana and their statements. After an evidentiary hearing, the magistrate judge issued a report and recommendation that the motion to suppress the marijuana be denied, finding that the traffic stop was permissible, that Morgan's conversation with Goltz concerning the war on drugs was a consensual encounter, and that Morgan had consented to the search of the van. The magistrate judge found alternatively that Goltz had had reasonable suspicion to detain the defendants long enough to walk his dog around the van. The magistrate judge recommended suppression of Morgan's admission that she was the owner of the suitcase because she had not been informed of her Miranda rights, but recommended that other statements of the defendants be admitted.

The district court did not adopt the report and recommendation and granted all motions to suppress. It concluded that Goltz had impermissibly expanded the scope of the traffic stop because he had detained the defendants without their consent or reasonable suspicion. Although Goltz had returned all of their documents, the court found it significant that he had not expressly told them they could be on their way. The court rejected the government argument that the trooper's conversation with Morgan was consensual, finding that "Morgan did not feel free to leave as Goltz quizzed her about drug trafficking" and concluding that no reasonable person in her situation would have felt free to leave when Goltz said he would conduct a dog sniff if she did not consent to a search of the van. (Mem. and Order, Mar. 13, 2000 at 10). In examining the question of whether Goltz had reasonable suspicion to permit further detention of the van for the dog sniff, the court focused on the facts individually. It concluded that there was nothing inherently suspicious about driving a rental car from another state, that many innocent people drive from a drug source

state to a demand state, that the women's contradictory statements about how long they had been in Arizona might have been a mistake, that many innocent travelers smoke and wear perfume while driving, that many people exhibit nervousness when stopped by police, that the duffle bags could have contained any number of non contraband items, and that Morgan and Walker might have decided to drive back to Detroit to accommodate Jones's move.

There are no issues on appeal about the validity of the initial stop or of the search of the van after the drug dog alerted to it. The van was stopped because of a problem with its license plate, and all concede Goltz had probable cause to search the van once the dog alerted to the presence of drugs. See United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994) (en banc). It is also clear that a dog sniff of the exterior of a vehicle is not a search. See United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999), cert. denied, 528 U.S. 1161 (2000). The government does not appeal the suppression of Morgan's identification of her suitcase.

The government argues that Goltz had reasonable suspicion to detain the defendants longer than the initial traffic stop, that Morgan consented to the dog sniff, and that the dog sniff was a de minimis intrusion. Appellees respond that there was no reasonable suspicion to permit their detention after the initial traffic stop, that Goltz impermissibly detained them when he asked Morgan what she thought about the war on drugs, and that the delay caused by retrieving the dog was an unreasonable detention. We review the district court factual findings for clear error, but its conclusion that the Fourth Amendment was violated is reviewed de novo. See United States v. Allegree, 175 F.3d 648, 650 (8th Cir. 1999), cert. denied, 528 U.S. 958 (1999).

The first issue we must determine is whether Goltz unreasonably detained the defendants by engaging Morgan in the conversation about drugs. Law enforcement

officers do not violate the Fourth Amendment by attempting to start a conversation with someone and asking questions; answers voluntarily given may be introduced as evidence. See Florida v. Royer, 460 U.S. 491, 497 (1983). The Fourth Amendment will be implicated, however, if an officer acts in such a way that a reasonable person would believe that he or she is not "free to decline the officer['s] requests or otherwise terminate the encounter." See Florida v. Bostick, 501 U.S. 429, 436 (1991). At the time that Walker decided to stop driving, the travelers had been given all their documents and had everything they needed to continue their trip. See United States v. Beck, 140 F.3d 1129, 1135 (8th Cir. 1998). The fact that Goltz had not explicitly said they could leave does not establish that the conversation with Morgan was not consensual. See Ohio v. Robinette, 519 U.S. 33, 39-40 (1996). Walker must have understood that they were free to go because she returned to the van and asked Morgan to drive. Her decision delayed their departure and caused Morgan to get out and walk around the van toward the driver side.

The change in drivers gave Goltz an opportunity to strike up a conversation, and he did not seize Morgan by asking her a question. See United States v. Mendenhall, 446 U.S. 544, 553-54 (1980). The district court found that Morgan did not feel free to leave, but an objective standard is employed to determine whether there has been a seizure. See Michigan v. Chesternut, 486 U.S. 567, 574 (1988). Under this standard the question is whether a reasonable person in the same circumstance would have felt free to leave. See id. We conclude that a reasonable person would have felt free to leave under all the circumstances. Although the question about drugs concerned a sensitive topic, it was not in itself inherently coercive. See United States v. Thompson, 106 F.3d 794, 798 (7th Cir. 1997) (trooper did not seize defendant by asking whether she had drugs or other contraband in vehicle); United States v. Lattimore, 87 F.3d 647, 653 (4th Cir. 1996) (en banc) (same); United States v. Werking, 915 F.2d 1404, 1409 (10th Cir. 1990) (same). There is no evidence that Goltz did anything to suggest that Morgan was required to engage in a conversation. She could have said she did not wish to discuss the topic

or that she wished to depart and could have continued toward the driver seat, but she engaged in the conversation. After a thorough examination of the record including the videotape, we conclude that the district court erred in concluding that Goltz impermissibly detained Morgan by asking the question.

Goltz did detain the travelers by telling Morgan that he would walk the dog around the van if she did not consent to a search. See Beck 140 F.3d at 1135-36 (reasonable person would not feel free to leave after being informed that officer intends to subject vehicle to dog sniff). We agree with the district court that Morgan did not voluntarily consent to a search of the van when she said "go ahead," but the Fourth Amendment was not violated if Goltz had reasonable suspicion to detain the van for the length of time it took to conduct the dog sniff. The first question is whether Goltz had a reasonable, articulable suspicion of criminal activity beyond the reason for which he had stopped the van. See United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997). Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." Id. (citations and quotation marks omitted). Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed in its totality. See Bloomfield, 40 F.3d at 918.

At the time of this stop, Goltz had been a state trooper for eleven years and had seven years experience as a drug dog handler. He was experienced in detecting contraband and had taught classes on criminal patrol and interdiction for the Nebraska State Patrol. Goltz testified at the suppression hearing about a number of factors that aroused his suspicion. He observed an intense smell of cigar smoke and deodorizer or perfume after he approached the van. Walker and Morgan were unusually nervous and avoided eye contact, but Morgan later looked at him when she denied there was cocaine or methamphetamine in the van and looked away when asked about marijuana. The two women had flown to Arizona, a marijuana source

state, and were driving back to Detroit, a drug demand state. The duffle bags in the van were unusually large and looked new, and one appeared to contain square objects. The stories Walker and Morgan gave diverged in respect to the length of their trip and the reasons for it, and Walker told Goltz that she could not remember if she had visited any other Arizona towns.

Similar facts have been held to be indicators of criminal activity in other cases, where reasonable suspicion has been found on the combination of a driver's extreme nervousness and the presence of masking odors, Bloomfield, 40 F.3d at 918-19, on contradictory statements, United States v. Edmisten, 208 F.3d 693, 694 (8th Cir. 2000), cert. denied, 121 S.Ct. 1158 (2001), or on distinctive travel plans, United States v. Wood, 106 F.3d 942, 946-47 (10th Cir. 1997). Appellees rely on Beck, 140 F.3d at 1137-39, to argue that the facts here also do not support reasonable suspicion. The driver in Beck was nervous and driving from a drug source to a drug demand state, fast food trash but no luggage was visible in the car, and the car had been rented by someone not present. See id. This case is not the same as Beck. Here, Goltz was a very experienced officer whose suspicion justifiably increased as he obtained more information and became aware of a number of facts and circumstances giving rise to reasonable suspicion of criminal activity. The district court erred by considering each fact separately rather than in their totality and in its conclusion that Goltz did not have reasonable suspicion to delay the travelers for the dog sniff.

Even if the facts had not been sufficient for reasonable suspicion, however, a short detention for a dog sniff would not violate the Fourth Amendment. See $404,905.00 in U.S. Currency, 182 F.3d at 647-49 (two minute delay for dog sniff a de minimis intrusion). Here, the dog was at the scene from the beginning, and it only took a short time to walk the dog over to the van where it alerted to the presence of drugs. The exact number of minutes is uncertain, but Goltz testified that "well under ten minutes" passed between the end of his conversation with Morgan and the dog alerting to the marijuana. We do not believe that the few minutes difference between

the time in this case and $404,905 has constitutional significance. The delay caused by conducting the dog sniff did not violate the Fourth Amendment.

For these reasons we reverse the order suppressing evidence, except for the suppression of Morgan's identification of her suitcase which is affirmed, and we remand to the district court for further proceedings.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent. I would affirm the judgment of the district court on the basis of that court's well reasoned opinion.

Once the officer delivered the violation card to Walker, the traffic stop had come to an end. The following language from the Court's opinion in United States v. $404,905.00 in U. S. Currency, 182 F.3d 643, 648 (8th Cir. 1999), cert. denied, 528 U.S. 1161 (2000), is instructive:

> But once the officer decides to let a routine traffic offender depart with a ticket, a warning or an all clear–a point in time determined, like other Fourth Amendment inquiries, by objective indicia of the officer's intent–then the Fourth Amendment applies to limit any subsequent detention or search.

The district court found the subsequent conversation was not consensual, and I cannot agree that this finding was clearly erroneous.

A true copy.

ATTEST:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT

-9-