# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————————

No. 03-3271

————————

United States of America,     *
    *
        Appellant,     *
    *   Appeal from the United States
   v.     *   District Court for the
    *   Southern District of Iowa.
Francisco Ureno Guerrero,     *
    *
        Appellee.     *

————————

Submitted:   March 9, 2004
Filed:   July 2, 2004

————————

Before MURPHY, HEANEY, and SMITH, Circuit Judges.

————————

HEANEY, Circuit Judge.

The United States appeals the district court's[1] ruling suppressing 77 pounds of cocaine seized from a vehicle operated by Francisco Ureno Guerrero. Largely based on the communication difficulties between Guerrero, who is Spanish-speaking, and an English-speaking Iowa State Trooper, the district court held that Guerrero was subjected to a Fourth Amendment seizure without probable cause, that Guerrero did not knowingly and voluntarily consent to the search of the vehicle, and that a

———————————

[1] The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

reasonable officer would not believe that Guerrero knowingly and voluntarily consented to a search.  For the reasons stated below, we affirm the district court.

## BACKGROUND

On April 19, 2003, Iowa State Trooper Jason Bardsley stopped a 2001 BMW SUV on Interstate 80 because the vehicle was traveling five miles over the speed limit and had tinted windows that appeared to be too dark.  The traffic stop was recorded on a video camera installed in Bardsley's patrol car.[2]  Upon approaching the vehicle, Bardsley asked Guerrero if he knew how fast he was going.  Guerrero answered, "Chicago."  During his questioning, Bardsley had to repeat his requests several times and, at times, had to use hand gestures before Guerrero understood the question or was able to respond.  In answering Bardsley's questions, Guerrero spoke in Spanish, in extremely broken English, or would repeat verbatim what Bardsley had asked him.

While questioning Guerrero, Bardsley noticed that Guerrero appeared very nervous, that air fresheners had been placed in several vents in the dashboard, and that the garment bag in the rear of the vehicle appeared to be fairly empty.  Bardsley then asked Guerrero to accompany him to his patrol car and sit in the back seat. Realizing that Guerrero was having problems understanding English, Bardsley asked Guerrero, "Poquito English?," to which Guerrero responded, "Poquito English." Bardsley also twice asked Guerrero, "Do you read English?," to which he received no response.  Bardsley then asked, "A little?," and Guerrero responded, "A little."

During the stop, Guerrero told Bardsley, in very broken English, that he was returning from Las Vegas where he had spent one week visiting his children. Guerrero attempted to communicate the address for his children in English, but was unable to provide a phone number.  Guerrero also told Bardsley that the SUV

---

[2] The videotape of the stop is part of the record in this case.

belonged to his brother and that he had purchased it one week earlier. The registration indicated that it had actually been purchased four months earlier.

Bardsley contacted the El Paso Intelligence Center (EPIC)[3] and was advised that Guerrero's name was "flagged" in the INS computer and that the DEA had participated in a cocaine transaction at Guerrero's home address. EPIC gave Bardsley a phone number to obtain further information as to why Guerrero's name was "flagged" in the INS system, but Bardsley never called the number, nor did he ask Guerrero about his immigration status. Bardsley also chose not to find out whether the DEA drug buy address was specific to a building or an apartment, or whether it occurred while Guerrero lived there. Bardsley then issued a warning ticket to Guerrero.

After returning Guerrero's license and registration, Bardsley asked, "Hey, Francisco, before you take off, I'm all done with you, do you have . . . you don't have anything illegal in the car with you today, do you?" Guerrero responded in the negative. Bardsley then asked Guerrero if he had any knives in the car. After repeating this question four times, Bardsley asked, "Like cut?" Guerrero denied having any knives. Bardsley then asked if Guerrero had any "pistolas," cocaine, marijuana, or methamphetamine. Guerrero denied having any pistolas, cocaine, or marijuana, but did not understand the word methamphetamine. Then Bardsley asked if he could search the vehicle. Guerrero said several inaudible words in Spanish and English before responding, "Yeah." When Bardsley asked a second time if he could search the vehicle, Guerrero responded, "Okay. Si."

---

[3] EPIC is a mass intelligence center comprised of approximately 20 to 25 computer databases from the federal government, including such entities as the INS, DEA, and FBI.

Prior to searching the vehicle, Bardsley filled out a Spanish-language consent-to-search form and showed it to Guerrero. Bardsley never asked Guerrero if he could read Spanish, but explained the form to Guerrero in English, pointing to the Spanish section of the form. When he finished reading the form, Bardsley asked, "Si, you comprende?" Guerrero replied, "Yo comprende" and signed the form. While Guerrero remained in the back seat of the patrol car, Bardsley searched the vehicle and noticed that the passenger seat bolt covers were scarred, there were metal shavings in the track of the seat, and the carpet under the middle console area appeared to have been cut. Bardsley returned to his patrol car and requested assistance from a K-9 unit. Bardsley also asked Guerrero to follow him to a garage at the next exit, which Guerrero agreed to do. After the drug dog alerted to the front and passenger sides of the car at the garage, the officers removed the front seats exposing jagged cuts in the carpet. The officers discovered a trap door under the carpet containing 26 wrapped packages consisting of a total weight of 77 pounds of cocaine.

Guerrero was charged with one count of possession of cocaine with intent to distribute. Guerrero filed a motion to suppress the evidence seized from the SUV. The district court granted the motion finding that Guerrero was subjected to a Fourth Amendment seizure without probable cause, Guerrero did not voluntarily and knowingly consent to the search, and it was not reasonable for the law enforcement officer to believe that the consent was voluntarily and knowingly made. The United States filed this interlocutory appeal arguing that the district court erred in granting Guerrero's motion to suppress because: 1) Bardsley reasonably believed Guerrero knowingly consented to the search of the vehicle; 2) reasonable suspicion existed to expand the scope of the traffic stop; and 3) the search was supported by probable cause.

## ANALYSIS

### A.     Consent to Search

"[W]hether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998). The determination of whether a reasonable officer would believe that Guerrero consented is a question of fact, subject to review for clear error. United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001). The focus is not whether Guerrero subjectively consented, but rather, whether a reasonable officer would believe consent was given and can be inferred from words, gestures, or other conduct. Id.

The government argues that Bardsley reasonably believed that Guerrero consented to the search because: Guerrero did speak some English and was generally able to grasp Bardsley's questions; Guerrero stated he was able to read some English; Bardsley provided Guerrero with a Spanish version of the consent form; Guerrero never indicated that he was unable to read or understand the form and responded "yo comprende" when asked if he understood the form; Guerrero signed the consent form; Guerrero did not object while Bardsley conducted the search; and, when Bardsley asked Guerrero to follow him to the garage he complied without difficulty.

Based on the facts of this case and a careful review of the videotape, we agree with the district court that Guerrero did not understand a majority of what Bardsley said throughout the traffic stop. When asked how fast he was going, Guerrero answered, "Chicago." Bardsley needed to ask Guerrero several times for his license and registration, to get out of the vehicle, to sit in the back seat of the patrol car, how long he had been in Las Vegas, how long he had lived at his current address, and if he had any knives in the car. All these inquiries required repetition, gestures, and the use of simple English before Guerrero could respond. Even when Guerrero did

-5-

respond, he answered in broken English, often merely repeating the same words Bardsley used. Similarly, with regard to Guerrero signing the consent form, Bardsley never asked Guerrero if he could read Spanish, but instead pointed to the words in Spanish while reading them in English. Bardsley then asked Guerrero, "Si, you comprende?" and Guerrero echoed him by responding "Yo comprende." This response is ambiguous at best, as the translation would be something akin to "I you understand."[4]

In addition, from reviewing the exchange between Bardsley and Guerrero, it is clear that a reasonable officer would have been aware that Guerrero was having difficulty understanding the questions. Bardsley's own actions show such an awareness: Bardsley asked most of his questions several times, spoke in simple sentences, and often utilized hand gestures; Bardsley spoke in Spanish when he was able, using words such as "pistolas" and "poquito" and simplified his English, using "like cut" for knife and "no pay" for a warning ticket; and Bardsley chose to use the Spanish consent form when obtaining Guerrero's signature for the search.

These facts support the district court's holding that Guerrero and Bardsley were unable to effectively communicate and that Bardsley was aware of the communication barrier. As a result, we hold that the district court did not commit clear error by finding that a reasonable officer would not believe that Guerrero was able to knowingly and voluntarily consent to a search.

---

[4] The district court pointed out that the correct response in Spanish would be "yo comprendo" not "yo comprende," suggesting that Guerrero was likely merely repeating verbatim what Bardsley had said.

## B.     Reasonable Suspicion

When reviewing a determination of reasonable suspicion, this court reviews the district court's findings of fact for clear error and the determination of the existence of reasonable suspicion de novo. United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002). Whether an officer has reasonable suspicion to expand the scope of the traffic stop beyond the primary purpose of the stop is determined by looking at the totality of the circumstances, based on an officer's experience and training. Id. It is undisputed in this case that the initial stop of Guerrero was valid; it would be an unreasonable extension of the scope of the stop, however, for Bardsley to further detain Guerrero or his vehicle unless something occurred during the traffic stop to generate the necessary reasonable suspicion to justify further detention. United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001).

The government argues that Guerrero was never subjected to a Fourth Amendment seizure because he was given all his papers back and told that Bardsley was "all done with him." See United States v. White, 81 F.3d 775, 778 (8th Cir. 1996) (stating that after a routine traffic stop had been completed and White's license and registration returned, "the encounter became nothing more than a consensual encounter between a private citizen and a law enforcement officer"). The government further asserts that Guerrero was not subjected to the threatening presence of several officers, the display of any weapons, any physical touching, or the use of language or tone of voice indicating that compliance with Bardsley's request was compelled. See United States v. Johnson, 326 F.3d 1018, 1021-22 (8th Cir. 2003) (listing circumstances indicative of whether a defendant was seized). Instead, the tone of the exchange was cooperative and, at the time Bardsley asked to search the SUV, Guerrero had everything he needed to continue on his journey.

For Fourth Amendment purposes, a seizure occurs when a reasonable person would not feel free to leave. Jones, 269 F.3d at 925. The district court concluded that

Guerrero's inability to understand English, Bardsley's statement "before you take off," and the fact that Bardsley continued to talk to him and ask questions while Guerrero was sitting in the back seat of the patrol car would reasonably lead a person in similar circumstances to believe that they were not yet free to leave. We agree. Most English-speaking people, and certainly Guerrero, who was having trouble understanding Bardsley, would not have understood that the stop ended and a voluntary interaction with Bardsley began. See United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994) (finding a seizure occurred because no reasonable person would feel free to leave when police kept questioning the defendant about drugs and asked for consent to search the vehicle, even though all documentation was given back to him).

The government also argues that even if Guerrero was detained at the time of the search, the detention was justified by reasonable suspicion because: 1) the placement of air fresheners in several vents; 2) the fact that Guerrero seemed extremely nervous; 3) Guerrero's inconsistent and limited details about his trip; and, 4) the information obtained from EPIC. The government asserts that the district court erred in holding that each of these factors could have an innocent explanation. Instead, the district court should have considered the totality of the circumstances. Linkous, 285 F.3d at 720 ("Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed together.").

After considering the totality of the circumstances, we agree with the district court that they do not give rise to reasonable suspicion. The use of air fresheners shows that Guerrero either liked the smell of air fresheners or that he was trying to cover up an odor, but that odor need not be the smell of drugs. Guerrero's nervousness is also of limited significance, as this court has held that it cannot be deemed unusual for a person to exhibit signs of nervousness when confronted by an officer. United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998). Third,

Guerrero's inconsistent and limited details about his trip were consistent with the language barrier that existed between him and Bardsley. Finally, we do not lend much credence to the information from EPIC, as Bardsley did not find it significant enough to follow up on the information. Looking at these factors together, we cannot say that the district clearly erred in finding that Bardsley lacked reasonable suspicion to expand the scope of the search.

## C.    Probable Cause

We review the determination of whether probable cause existed de novo. United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997). "Probable cause 'exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place.'" United States v. Ameling, 328 F.3d 443, 448 (8th Cir. 2003) (quoting United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000)).

Reasonable suspicion is a less demanding standard than probable cause. Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Citing the same factors as in its reasonable suspicion argument, the government asserts that the totality of circumstances gave rise to probable cause as well. Facts which do not support a finding of reasonable suspicion, however, cannot support a finding of probable cause.

## CONCLUSION

Francisco Guerrero is a Spanish-speaking individual who was involved in a valid traffic stop with Iowa State Trooper Jason Bardsley, who speaks English. Due to the communication barrier between Guerrero and Bardsley, and Bardsley's failure to obtain a Spanish-speaking interpreter, Bardsley illegally expanded the scope of the traffic stop without reasonable suspicion, probable cause, or valid consent. We find

that the district court did not commit clear error in suppressing the evidence obtained in the search of Guerrero's vehicle.  Accordingly, we affirm the district court.

MURPHY, Circuit Judge, dissenting.

I dissent from the decision to suppress 77 pounds of cocaine on the grounds that Francisco Guerrero's consent to search his vehicle was not voluntary because he did not speak English fluently.  On the government's appeal in this case, we view the same videotape on which the district court based its findings.  The videotape of the conversation with Trooper Bardsley reveals that Guerrero was able to comprehend English and did in fact communicate in the language.  Although questions sometimes had to be repeated, the full interchange shows that Guerrero had a working knowledge of English and that the two men were able to make themselves understood on the topics they addressed.  The district court erred by focusing on isolated facts to find that Bardsley could not have reasonably believed that Guerrero had voluntarily consented to the search of the BMW and to conclude that the trooper did not have reasonable suspicion to prolong the traffic stop.  I respectfully submit that we should reverse and remand the case for trial.

Since the Fourth Amendment issues cannot be resolved without examining the full content and sequence of the interchange between Guerrero and the trooper, it must be set out here in detail.  After Guerrero was stopped for speeding and having illegally tinted windows, Trooper Bardsley asked him for his driver's license. He produced it immediately.   Bardsley asked him how fast he was going.  Guerrero apparently heard the word "going" and replied "Chicago."  Bardsley then asked to see the vehicle registration, and Guerrero tried to locate it.  Bardsley helped him find it. After looking over the papers, Bardsley asked Guerrero whether he had purchased the BMW.  Guerrero responded that his brother had.  The trooper asked Guerrero to come back with him to the patrol car, and Guerrero accompanied him.  While they were walking, Bardsley asked Guerrero if he had any weapons or pistolas.  Guerrero said

-10-

no and opened his coat to show that he had none. Bardsley patted him down, and told him to take a seat in the car.

Bardsley asked Guerrero where he was coming from, and Guerrero answered Las Vegas. Bardsley asked what was going on there, and Guerrero referred to his children. When Bardsley asked if his children lived in Las Vegas, Guerrero's initial response is inaudible. Bardsley asked "Poquito English?", and Guerrero's reply is again inaudible. Bardsley repeated his question about whether the children lived in Las Vegas, and Guerrero answered that his children were with his wife apart. Bardsley asked about his wife, and Guerrero responded that they were apart. Bardsley asked if she lived in Las Vegas, and Guerrero said that she did. Bardley then asked where his brother Alberto was; Guerrero answered that Alberto was in Chicago.[5] Trooper Bardsley asked if Alberto had just bought the car; Guerrero explained that Alberto had bought the car the week before in Chicago. Bardsley asked Guerrero if he knew Alberto's birthday. Guerrero responded that he did not, but when asked Alberto's age, he replied 26. When Bardsley again asked about Alberto's birthday, Guerrero said he did not know the day, but it was in September. Bardsley responded, "You don't know the day. He's your brother and you don't know his birthday?" Guerrero answered, "Yeah, no. There's almost five brothers, seven brothers." Bardsley stated that he had three brothers, a mom, and a dad, and he knew all their birthdays. Guerrero pointed out that he had children too. Bardsley asked Guerrero how long he had been in Las Vegas, and he answered one week.

After a short interruption by a radio transmission, Guerrero asked Bardsley whether his windows were tinted too much. The trooper told him that they were and that he needed to slow down because he had been driving 70 miles per hour. Guerrero said okay. Bardsley explained that the speed limit in Iowa was 65 miles per hour, and Guerrero responded "too much." Bardsley told Guerrero that he needed to

---

[5]The vehicle registration showed Alberto as the owner of the BMW.

-11-

get the windows fixed and watch his speed, and Guerrero asked whether he needed to get the windows fixed right away. Bardsley responded he could wait until he returned home. Bardsley then asked for the address of Guerrero's children in Las Vegas. The police radio cut in at this point, and Guerrero's response is inaudible. After the radio quieted, Bardsley asked Guerrero if Addison was in Chicago,[6] and he stated that it was.

The radio transmitted again, and the record shows that in this transmission Bardsley learned from the El Paso Intelligence Center that federal drug agents had participated in a cocaine purchase at the address on Guerrero's documents and that he had been flagged by the Immigration and Naturalization Service (INS). Bardsley asked Guerrero how long he had lived at the Chicago address. At first Guerrero did not understand, and Bardsley repeated the question. When it appeared that Guerrero did not understand the word "long", Bardsley reframed his inquiry and asked, "How long, one year, two years?" Guerrero replied one month. Trooper Bardsley asked again about Alberto's birthday; Guerrero's response is inaudible. Bardsley then asked about his children's address in Las Vegas, and Guerrero provided an address. When Bardsley asked for their phone number, Guerrero said that he did not know it.

Bardsley then told Guerrero that he was going to check the windows on the BMW and that he should stay in the patrol car. Trooper Bardsley exited the patrol car, approached the passenger side of the BMW and looked at the windows before walking back and asking for the keys. He returned to the BMW and inspected the windows and observed the front seats.

After returning to the patrol car, Bardsley informed Guerrero that the windows were too dark and asked him where he worked. Guerrero answered "electric."

---

[6]The same address in Addison, Illinois was listed on the vehicle registration and on Guerrero's driver's license.

Bardsley repeated "electric?", and again asked where Guerrero worked. Guerrero replied with his brother. After shuffling some papers, Trooper Bardsley told Guerrero that he was only going to give him a warning and that he did not have to pay anything. Guerrero said yeah. Bardsley reminded him that the window tinting needed to be fixed and that he needed to slow down and asked Guerrero to sign the warning ticket by the red star. He asked if Guerrero could read English. Bardsley repeated the question, and Guerrero said something inaudible on the tape. Bardsley asked "a little?" and handed Guerrero the warning ticket and returned his driver's license. Guerrero asked again about the windows, and Bardsley replied that they did not need to be fixed immediately but could wait until he returned to Chicago and that he would not have to pay anything. He asked if Guerrero understood—"comprende?" Guerrero agreed, answering "comprende."

As Guerrero was preparing to leave the car, Bardsley said, "Hey, Francisco, before you take off, I'm all done with you, you don't have anything illegal with you in the car with you today, do you? Any knives?" Guerrero indicated that he did not understand so Bardsley repeated his question. Guerrero repeated the word "knives" in an uncertain tone. Bardsley said "knives, like cut" and asked about pistolas too. Guerrero replied no. Bardsley asked Guerrero separately if he had marijuana or cocaine, and each time Guerrero quickly answered that he did not. Bardsley then asked about methamphetamine. Guerrero repeated the word to show that he did not know what it meant, and Bardsley said "like speed." Guerrero said he had none. Trooper Bardsley then asked if he could search the car to make sure, and Guerrero said yeah. When asked again, he said, "Okay. Si."

Trooper Bardsley asked Guerrero to hold on and produced a written consent form printed in both English and Spanish. Bardsley showed Guerrero the Spanish form, while explaining it in English. Guerrero responded okay after Bardsley finished explaining the form. Bardsley asked him, "Si you comprende?", Guerrero replied, "Okay. Yo comprende." Bardsley informed him that if he was willing to give

consent to search the car, he needed to sign the form by the X. Guerrero then signed by the X on the Spanish version of the form. Bardsley asked Guerrero to wait in the patrol car while he searched the BMW, and Guerrero said okay. Bardsley told Guerrero to open the car door and yell at him if he needed anything. Guerrero asked, "Open the car door?" Bardsley explained again that he should open the car door if he needed something. Guerrero said okay.

Trooper Bardsley then searched the car. He noticed some nut covers located inside the vehicle and found some metal shavings on the floorboard that made it appear that the console had been altered. He suspected that specially engineered compartments had been constructed in the console to hide drugs, similar to those he had seen in searches of other BMWs. Guerrero did not object in any way or indicate that he did not consent to the search.

When Trooper Bardsley returned to the patrol car, he asked Guerrero how much money he had on him and if he could see his wallet. Bardsley exclaimed that he had "much dinero" in it. Guerrero agreed, saying "mucho." Bardsley asked how much, and Guerrero responded $1000. Bardsley said there was more than that, and Guerrero responded $1040. Bardsley asked where the money came from, and Guerrero said Las Vegas. Then Bardsley asked if Guerrero would follow him to the next exit to continue the search. Guerrero agreed to follow the trooper to a garage at the next exit, then asked why they were going there. Bardsley answered that he wanted to look at the car some more. After calling a canine unit, he left the scene of the roadside stop. Guerrero followed in the BMW and also left the highway at the next exit.

At the suppression hearing in the district court, the videotape and consent form were admitted into evidence. Trooper Bardsley and the canine handler testified, but Guerrero did not. Bardsley is a nine year veteran of the Iowa Department of Public Safety (DPS) with extensive specialized training in highway drug interdiction. He

is also a certified field training officer and interdiction instructor for the Iowa state patrol and the DPS. He testified that Guerrero seemed nervous, but that he understood and responded to most questions right away. In those instances where he did not, the trooper said he asked specific follow up questions. Bardsley perceived Guerrero's occasional hesitation as "more of a stalling technique for him to answer my questions maybe in a little bit better way." He testified that he did not believe that Guerrero was having much of a problem understanding him because Guerrero was answering questions. The district court made no finding that Bardsley's testimony lacked credibility.

Trooper Bardsley also testified about a number of factors that raised his suspicions during the traffic stop. When he first approached the BMW, he noticed multiple air fresheners in the vehicle's front air vents. This aroused his suspicion because he knew that air fresheners were often used to mask the smell of drugs, and Guerrero was driving a recent model luxury car. When Bardsley asked him for his driver's license, he noticed that Guerrero's hands were trembling so much that he could barely remove the license from his wallet. While their conversation continued, Bardsley learned that Guerrero had given him information about the vehicle's purchase which conflicted with the vehicle registration. His suspicions were further heightened when he learned that there had been a cocaine sale at the address on Guerrero's driver's license. He observed there was no luggage in the BMW other than a hanging garment bag with apparently little in it, even though Guerrero had said that he had been in Las Vegas for a week. Bardsley testified that he also found it odd that Guerrero changed the number of brothers he had and initially did not provide an address for his children, whom he allegedly had just visited in Las Vegas.

The district court found that a "communication barrier" existed between the two men, concluded that the trooper did not have reasonable suspicion to detain Guerrero after returning his documents, and found that Guerrero did not voluntarily consent to the search of the BMW. The court's analysis concentrated on those parts

of the interchange between Bardsley and Guerrero where questions needed to be repeated. It stated that Guerrero's "limited ability to understand English in all likelihood prohibited him from understanding subtle nuances" in what the trooper said after giving him his paperwork (emphasis added). This conjecture is not supported by examination of the entire conversation. The videotape shows that Guerrero understood the majority of the questions when first posed and provided answers and that he indicated when he did not understand something.

Guerrero was not just a passive participant responding to Bardsley's questions, for sometimes he initiated questions of his own, as when he asked whether his windows were tinted too much and later whether he needed to get them fixed right away. Guerrero also asked Bardsley why he wanted him to go to the garage at the next exit. The videotape provides the viewer with the same opportunity to judge the highway encounter as the district court had, to hear what was said and to observe the tone and demeanor of the participants. Since Guerrero did not testify at the suppression hearing, the district court had no additional opportunity to judge Guerrero's English language ability. It also made no finding that Trooper Bardsley was not credible in his hearing testimony. The record as a whole leads to the conclusion that the court clearly erred in finding Guerrero had "little understanding to comprehend" English and was therefore unable to give his voluntary consent.

The test is not whether Guerrero was a good English speaker and knowingly consented to the search, but whether he was able to understand enough to make a voluntary, uncoerced decision and to communicate his position. Schneckloth v. Bustamonte, 412 U.S. 218, 233 (1973). A search of a vehicle does not violate the Fourth Amendment if the driver has voluntarily consented to it. Id. at 222. Whether a search is consensual depends on the totality of the circumstances, including both the characteristics of the accused and the details of the interrogation. United States v. Galvan-Muro, 141 F.3d 904, 907 (8th Cir. 1998). The Fourth Amendment does not require that an individual knowingly consent, and he may voluntarily consent to a

search even if he did not know that he had a right to refuse. Schneckloth, 412 U.S. at 233. "Voluntariness is a question of fact to be determined from all the circumstances," Ohio v. Robinette, 519 U.S. 33, 40 (1996), and our review is for clear error. United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998). Furthermore, police officers do not necessarily have to inform a detainee that he is free to go in order for his consent to search to be deemed voluntary. Robinette, 519 U.S. at 39-40. A police officer's reasonable, if erroneous, belief that a defendant consented to the search is recognized as voluntary consent. Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990). Reasonableness is measured in objective terms by examining the totality of the circumstances, Robinette, 519 U.S. at 39.

Our cases show many examples where speakers with less than fluent English were found to have consented to a search despite language difficulties. See, e.g., United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004); United States v. Mendoza-Cepeda, 250 F.3d 626, 629 (8th Cir. 2001); Sanchez, 156 F.3d at 878; United States v. Cortez, 935 F.2d 135, 142 (8th Cir. 1991). The videotape of the traffic stop in Cedano-Medina, for example, showed that the defendant had voluntarily consented to the search even though he spoke broken English throughout the stop, had trouble communicating with the trooper, and was only offered an English language consent form to sign. 366 F.3d at 687. When the trooper there sought consent to search the vehicle, the defendant made it clear that he did not understand what the trooper was asking and responded with questions about dog food. Id. at 685-86. The trooper testified that he thought the two were able to converse, however, and that in his mind the defendant had given his consent. Id. at 686.

When the entire exchange between Guerrero and Bardsley is considered as a whole, it is apparent that the two were able to communicate even if it was sometimes necessary to repeat questions. While Guerrero had difficulty with particular words, he conversed with the trooper and answered most of his questions. Unlike the

defendant in <u>Cedano-Medina</u>, Guerrero expressed no confusion about what Bardsley was asking him when he gave his consent to the search. <u>Id.</u> at 685-86. After giving oral consent twice, Guerrero signed a written consent form. He later affirmed his consent to the search by following the trooper to the next exit to allow the search to continue. <u>See</u> <u>Cortez</u>, 935 F.3d at 142 (Spanish speaking defendant who had orally consented to a search and signed bilingual consent form affirmed consent by agreeing to move van to another location to continue the search). Guerrero's actions also demonstrated his consent.

It was not unreasonable for the Trooper Bardsley to believe that Guerrero had consented to the search after he orally consented twice, signed a written consent form in his native language, followed the trooper to another location to continue the search, and did not object at any time to the search. The videotape shows that none of the circumstances suggesting coercion were present: Guerrero was not detained and questioned for an unreasonable period of time; the officer did not intimidate, or make any promises or misrepresentations to him; Guerrero was not in custody when consent was given and did not object to the search; and the search occurred in a public place. <u>See, e.g.</u>, <u>Sanchez</u>, 156 F.3d at 878. The record reveals both that Guerrero voluntarily consented to the search and that the trooper reasonably believed that he had.

The district court's analysis of whether Bardsley had reasonable suspicion to detain Guerrero focused on each fact cited by the trooper in isolation, rejecting each individually as without significance, instead of considering all the factors in combination. The court said it could not "conclude how the nature of the luggage . . . was in any way suspicious" since it appeared that the hanging garment bag was not completely empty. It rejected Guerrero's nervousness as a significant factor "because it is common for a person to be nervous in police presence." The fact that Guerrero had multiple air fresheners in the front vents of a 2001 BMW could be a "wholly innocent fact that does not warrant suspicion that criminal activity was afoot." Guerrero's inconsistent responses to Bardsley's questions were dismissed on the basis

-18-

that he was "unable to understand much, if not most of what Trooper Bardsley was saying to him." The court additionally found "minimal support at best" in Bardsley's prior experience with BMWs with specially constructed compartments to transport drugs, because "it would implicate a large class of motor vehicles."

An officer may expand the scope of a traffic stop if he has reasonable suspicion of other criminal activity based on the totality of the circumstances and informed by his training and experience. United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002). An officer's "suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." Id. To determine whether an officer had reasonable suspicion, courts must look at the totality of the circumstances and not at each individual factor standing alone. United States v. Jones, 269 F.3d 919, 927 (8th Cir. 2001). The police officer must be aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion" of a crime. Beck, 140 F.3d at 1136. Reasonable suspicion may exist if there is a combination of suspicious factors even if each individual factor alone would not be enough. Jones, 269 F.3d at 929.

Whether particular facts add up to reasonable suspicion is reviewed de novo and material findings of historical fact for clear error. Linkous, 285 F.3d at 720. Trooper Bardsley had extensive specialized training and experience in highway drug interdiction, and this factor should not be disregarded in determining whether he had reasonable suspicion to extend the stop. United States v. LeBrun, 261 F.3d 731, 733 (8th Cir. 2001). At the suppression hearing, he testified about a number of articulable facts that raised his suspicion, including multiple air fresheners in the front air vents of a new and expensive BMW, no luggage other than the slim hanging bag, Guerrero's extreme nervousness, the many inconsistencies in Guerrero's statements, and the information he had received by radio transmission. These factors are to be

considered under the totality of the circumstances and not in isolation.  Beck, 140 F.3d at 1136.

The district court's analysis on the issue of reasonable suspicion was flawed because it did not consider the facts "in their totality."  United States v. Morgan, 270 F.3d 625, 631 (8th Cir. 2001).  Morgan was also a case in which the district court erred  by examining each fact individually and by concluding that each could have an innocent explanation. It found "nothing inherently suspicious" about driving from a drug source state, inconsistent statements that "might have been a mistake," odors from cigar smoke and perfume, nervousness, or the nature of the luggage in the vehicle.  Id. at 629.  We concluded there that the court had erred by not considering the whole sequence of the trooper's observations on the issue of reasonable suspicion. Id. at 631.  The order suppressing the drug evidence was reversed and the case remanded, id. at 632, just as it should be here where an innocent explanation was advanced for each fact cited by the experienced trooper, rather than considering them in combination.

In sum, the record when viewed as a whole leads to the conclusion that the trooper had reasonable suspicion to extend the traffic stop and that it was clear error to find that he did not reasonably believe that Guerrero had consented to the search of his vehicle.  The decision suppressing evidence of the cocaine concealed within the BMW should be reversed  and the case remanded for trial.

_____